Thank you, Your Honors. My name is Brian Leslie. I'm representing Osvaldo Lopez. I'd also like to add to the profusion, Judge Pollack, thank you for accommodating my schedule. I appreciate that very much. I'd like to reserve two of my minutes, if I may. I think the best place to begin is to clarify exactly what we are claiming here. We do not claim that there was not reasonable cause to make a stop. And we also would agree that the officers acted reasonably by taking precautions to protect themselves in making the stop. In other words, the multiple cars, the manner in which the stop was made. Our claim is that there was not probable cause to arrest Mr. Lopez, that this was especially true once the officers were able to see him, although we believe it was true before then as well. And we believe that the district court properly found that this was an arrest given the manner in which the officers proceeded after Mr. Lopez exited the car. Interestingly, I think one of the cases that engages in this mode of analysis the best is the Tillman case that the government cited in its additional letter that I received over the last several days. And I don't want to get in the business of reading lengthy things to the panel, but the Tillman case was another instance where there was a high risk or high, you know, traffic stop, and the person emerged from the car with multiple gun points. And here's what the Tillman case said about it. It said, in summary, the police were justified in stopping Tillman's car to get a closer look at the driver to see if he fitted the description of the robber. We agree with that. In these circumstances, they were justified in making a show of force to protect themselves and passersby. We agree with that. In any event, after Tillman stepped out of the car and the officers could compare him with the robber's description, the Tillman case then says there was probable cause because it said, at the moment Tillman left his car, the police were immediately aware that he matched the description given on the police radio. And that was Tillman's basis for finding that there was probable cause to arrest him. How precise was the description of Mr. Tillman in that case? The description was not very precise, to be honest about it. The description that's given in the passage that I'm reading says he's a young black male of medium complexion, medium build, and height. But the car itself was also very distinctive. It was a purple Ford Explorer with shiny wheel hubs. And this was also a short time after the robbery, and I can look and see exactly how long after the robbery it was. Well, this was a very distinctive green car. You know, I wish you could – I think this is the kind of case you don't decide by enumerating precedents, but you look at the facts and try to see what was sensible for the police. Now, let me put it to you frankly. It seems to me they would have been crazy if they let this car go that had come up and rescued the green car. And if they were crazy to let it go, then they had to stop it. And if they were going to stop it, they had to arrest because they thought the person driving it was ready to shoot them. So what else did they – do you think they – do you really think they should have let the car just go away? No, Your Honor. We agree, and I absolutely think they would have been crazy to let the car go away. And I think they would have been crazy not to stop the car. And to take precautions, which meant arresting him? And to take precautions in the manner in which they stopped the car. Well, but that meant pulling out their guns. What they knew at the time they stopped the car was that my client's white Taurus had dropped this woman off who had used the keys to take the Ford Focus away. And they had been able to see through the tinted windows of my client's car that it looked like a young Hispanic male driving. And they had a fairly vague description of the young shooter. An extremely vague description. So they were perfectly justified in stopping the car, and we have never claimed otherwise. And I agree absolutely. And I also agree that they had the reasonable ability to take precautions at that point in time, believing that this might be the driver in the way they managed – they effectuated the stop. And I also agree with Your Honor's proposition that precedents are not particularly helpful because of the extreme factual nature of these matters. I cited the precedent simply for the mode of analysis in which the court had engaged. Our problem is that after the stop is made and they order him out of the car at gunpoint, we begin with the fact that they have only the most general of descriptions that describes a lot of different kinds of people. Well, I'm not sure that's right. That is to say, they say he's tall, right? He's slender. There's no description of eyeglasses. And he has on a sweater, a white sweater with a stripe, none of which match your client. Well, my – I've actually got two points on the description. First, the one they gave is extremely vague with very few particulars and fits a lot of people. The second is it doesn't fit my guy. My guy – Time's running, so if I can – see if I can get this precisely. Your argument then is it was all right to stop them, him. It was all right to take out their guns. It was all right after they stopped him to make him lie prone. It was all right to put handcuffs on him. But your problem is once they looked at him, once they got his identification, they knew his name was not the same name as Mr. Gomez, the owner of the green car, and once they realized whatever they had didn't match, at that point they take him downtown. And you're saying at that point, that arrest had no probable cause. I'm saying by that point there was no probable cause. I actually think that the circumstances up to that point, they should have stopped earlier. When he emerged from the car, when he was fully compliant, when he raised his hands, when he turned around, when he laid on the ground as instructed, when they patted him down and found that he had no weapons, when they then kept him in handcuffs and took him over to the police car, all of those things were excessive given the circumstances as they were unraveling on the spot. Were not excessive. They were excessive in the sense that they were beyond the scope of a Terry stop is what I meant. Oh, I see. They then turned those inmates into an arrest. And I think the arrest actually had more appreciation. Tell me why you think it was not a probability that he was in fact the shooter. He was the man who had arranged to rescue the car that the shooter had come from. And he set up this elaborate system where another person had the keys and he would trail. I mean, I would think anybody, and certainly any policeman in that position, yeah, he's likely the guy. Yes, Your Honor, I agree that that was their initial suspicion. And I say probable, not suspicion, probable. I think the probable cause evaporated when he got out of the car. And when he acted as compliant as he was. It evaporated because the descriptions didn't match. Because the description was too vague to begin with and he didn't match the parts of the description. And because of his behavior in fully complying with their demands and because when they patted him down, they saw that he wasn't armed and dangerous and didn't have a gun. And so those combination of events. And is it a contributing factor, yes or no, that they asked him for his ID? He had an ID that had him as the owner of this vehicle, which was a different name from the owner of the green car. Yes, that is. I definitely agree that's a contributing factor. And the passage of time. This is eight hours later. And so all they knew is that this guy had dropped off this lady who drove the Ford Focus away. But anything beyond that at that point was speculation on their part, not probability. Are you saying that the police should have told him he was free to go right then, there, and right next to the vehicle? No, I think, Your Honor, perhaps what they should have done is put their guns away and talk to him. And then gain consent or not without all of the other indications of being in cuffs, being on the ground, being taken over with a police car, and being treated at that point as if he's under arrest, as opposed to a Terry stop, which is a much less intrusive encounter and in which the person may or may not have given consent to search the car. I'm not saying they shouldn't have let him go.  I'm sorry, Your Honor. What, saying that it was vitiated by the arrest, by what you characterize as an arrest? We have said that it was the fruits of an arrest. We have not said that it was not consensual otherwise. We're saying it's the fruits of an arrest. And the government has actually conceded that point in their brief. Now, but you say that they shouldn't have told him you're free to go. But if that's so, given the circumstances of the stop, I think not saying anything at all would amount to a clear understanding on his part that he's not free to go and therefore he's arrested. So I don't think you can have it both ways. I may have misspoken in answering the question. What I meant was in terms of what the police should have done, they should have turned it into a Terry stop without all of the indications of an arrest. And once they were satisfied on the basis of the Terry stop, then he would have been free to go. But if he had given consent then, if he had even agreed to come and talk downtown, then he could have done it. What I'm saying is I think under the circumstances of the stop up to that point, he would not have understood himself to have been free to go unless they affirmatively told him that he was free to go. Well, I think that's probably true. At the end of any Terry stop, we do a lot of stops on the highway. Do you think they should have let him go after he identified himself? I think that after he identified himself and after they were satisfied that he was not the shooter, they should have told him that you're free to go. But I also think they shouldn't have used all the steps that they used to get him to have you know. And then they shouldn't have made any effort to find out what he had to do with the green car? Effort is different than arrest, however, Your Honor. Effort can be you're free to go, but we'd like to ask you some questions if you're willing to stay and talk to us. And so I'm just simply saying that a Terry stop in which the reasons for the original stop are satisfied and the person has been free to go is what should have occurred here, and that was the reasonable thing the officer should have done. And I mean we deal with these stops on the highway all the time where they give the, the officer gives the license back to the driver. The officer says you're free to go. I would like to talk to you for a few minutes if you're willing to stay and talk to me. And that's the classic, you know, Terry stop that then becomes a consensual encounter with the police. I think we could. Oh, sorry, go ahead. No, no, go ahead. I was about to say you could sit down. I'm sorry. At the point at which, at the point at which Mr. Lopez produces his registration with his identity, am I right that the police officers already knew the name of the owner of the green card, at least knew, had information back as to the name Mr. Gomez that was registered under Mr. Gomez's name? They had that information I believe not too many minutes after the incident occurred because they had the license plate number and they ran the plates. Right. So, yes, they had had that for many hours by the time this thought occurred. Is it your understanding, the record's a little fuzzy, is it your understanding that the police had obtained not merely the identity but a photograph of Mr. Gomez? The officer at the hearing testified that he could not recall whether they had obtained Mr., that they had not, he could not recall whether they had obtained his picture from the DMV. In Oregon there's a computer system where everything's digitalized and you can order it up, I think basically from the computer panels in the officer's cars, and he could not recall whether they had taken that step at the hearing. So our position was if he can't recall whether they did it, then that's a point in our favor because the government bears the burden of proof. But I don't know whether he did or not and he didn't recall. Okay. I think we have your argument at hand. We've taken you a little over. We'll make sure you get a moment for rebuttal. May it please the Court. Kelly Zusman, appearing on behalf of the United States. On Judge Noonan's question about what the officers knew about the registered owner of the car, they had gotten Mr. Lopez Gomez's name, but Officer Schmidt testified that he did not, in fact, have a photograph yet, and he explained that his car is not equipped with a computer nor a fax machine. The other thing that detects- May I read this passage to you? This is the testimony of Mr. Schuster- Yes. who had gone into the Fred Meyer store to review their videotape to see if the suspect, Mr. Gomez, or whoever the driver had been, had come into the store. And he's asked, well, in viewing the videotape, how are you going to be able to recognize Mr. Gomez? He responds, well, the clothing that was described that the suspect was wearing- and I'm trying to recall now. I know I did write it in my report, but I'm trying to recall that incident. We had a photograph that was given to us that somebody had brought out to the scene. The photograph of Mr. I don't remember. I can't recall if we had a photograph or not of Roberto. What do I make of that sort of flat statement? We had a photograph and then a retraction. I don't remember. Well, I think you could make of it that you have a number of pretty busy officers, and this hearing took place more than a year after the stop. And the other thing that Detective Shuster testified later on in response to Mr. Stuckey's questions was that they absolutely did not know at the time they made the stop of the white Taurus and the green Focus whether or not the registered owner was, in fact, the shooter. They simply didn't know that. Of course. All they knew was that the shooter had driven the car. Right. Right. And I think, Judge Pollack, you raised a good point about the precedence in this case. And what do all of the cases that Mr. Leslie and I have cited to you really do here? And I think what they do is provide the court with a spectrum. We have everything from United States v. Ricardo D. at one end of the spectrum to cases like Quinn and Tillman and Gallegos at the other end. And that is that what we have here is a generic description of the suspect. We know that he is a younger Hispanic. The officer who gave the description of the shooting incident himself was falling backwards as he's attempting to unholster his gun. And he gives a very vague description that he's taller and thinner while he's running away and pointing a firearm at him. But critical here, the critical difference between this case and the cases like Ricardo D. and United States v. Washington is we've got the car. We know it's the green Ford Focus. We've got the license plate. It's discovered by an officer five minutes after the incident, abandoned in a shopping center parking lot. Now, if Mr. Lopez had driven to that shopping center in his white Taurus and simply done his grocery shopping and then left the lot, he never would have been stopped. It was only because of all of his activity in retrieving the green Ford Focus that they knew had been involved in that earlier incident that caused the officers to stop him. Now, and your argument is that they had probable cause not only, excuse me, they had reasonable suspicion that allowed them to stop, and that appears to be common ground. Yes. And stop in the manner in which they did. That also appears to be common ground. Yes.  At the time that they effectuated the real arrest. That's to say they decided they weren't going to let him go. Judge King found that there was probable cause to believe that he was the shooter. We've also argued that there was at least probable cause to believe that he was an accessory after the fact. Yeah, and we've got a very awkward case for you on that point, which is Barnett. And, well, Barnett, they knew that the two women that they found by the car, one was removing the license plate and the other one was polishing it and cleaning it up. Taking off the fingerprints, and that sounds like accessory after the fact, and we held that there was no probable cause that they were accessory after the fact that would have permitted their arrest. If I remember correctly, this court held that there was reasonable suspicion, and in Barnett's case she didn't even argue probable cause. Probable cause arose after they spoke with her, and she gave several misleading answers to the police officers' inquiries. So here, though, we also have the Hill case. I'm not sure Barnett's right, but there it is, right? And also, you know, like I say, Barnett's involved in accessory after the fact charge, and also they were looking at the quantum of proof necessary to sustain a conviction. Here we go back to probable cause. Under a totality of the circumstances, was there a fair probability that the gentleman that they stopped in that heavily tinted white Ford Taurus was, in fact, the shooter? Now, it turns out he wasn't, but I think we all agree that it was reasonable for the officers to approach that vehicle with the assumption that he was, based upon the connection with the very specific car, plus the generic description that was given. I was struck by something which maybe I shouldn't have been, but I'll explain why. The description was of somebody who was taller. It was a bit of an arrogance, if that was true. And then it turns out that Lopez is 5'6", according to the doctor's information. Why would I stress all that? Well, I didn't want to stress it. He was shorter. That's not part of the record. Well, part of it is we're looking at a very closely related series of events. Now, when Mr. Lopez is sitting in that white Ford Taurus, they have no idea how tall he is. It's not until he emerges from the car. And so then are they supposed to immediately recognize, well, he's 5'6", he's not 5'8". He's shorter rather than taller. In United States v. Broadnicki, the case that we cited in our 20HA letter, noted that the discrepancies between the physical description given varied highly. I mean, everything from 5'3", up to 6 feet, from 220, up to 280 pounds. Was it Sammy Bontemps? Yes, but with respect, I don't think the argument is that they had to let him go as soon as he stood up and they realized he was 5'6". The argument is that they never let him go. And they took him downtown for questioning. So that at some point along the way, perhaps when they had him in the backseat of the car, and they had a chance to reflect on the fact that he was only 5'6", that he had eyeglasses on that hadn't been described, that he didn't have the same clothing on, that he was the owner of this vehicle and his name was not Gomez. At that point, not immediately, but at that point, they're supposed to evaluate, do we have probable cause? And your argument has to be, yes, they did. They did. And on the clothing change and the eyeglass change, we had an 8-hour time gap. At 8 hours from now, I can guarantee you I'm not going to be wearing these clothes and I'll probably be wearing glasses. Well, and if you're trying to escape and get your car surreptitiously, you're unlikely to wear the same clothes. Sure. Do we have any information in the record as to how strong his prescription was? No, there's nothing in the record about that. Okay. And on the removing him from the scene, you have a lot of testimony in the record about why they did that. And the officers explained that ordinarily they wouldn't have. They would have questioned him right there. The problem was the stop was conducted right in the middle of a bike lane on a heavily trafficked road. And so they asked, look, we're in a bad spot. Can we take you someplace nearby? And the defendant himself testified that he was in the back of that patrol car for all of two minutes. And he was in the police station for all of a half an hour. We have a very short time span. And I draw the court's attention to the Gallegos case in which all the officers knew there was that they were looking for a Hispanic gentleman wearing a red shirt. They picked up the suspect several miles away from the scene of a suspected burglary, guns drawn, handcuffed him, put him in the back of the car, drove him back to the scene of the burglary. And a time span of 45 minutes to an hour was the estimate given there. The court said, you had probable cause. There's no problem there. And they affirmed summary judgment on a 1983 claim. So what the officers did here, like I say, The problem was they were impeding traffic and they were in the middle of a bike lane. And he consented when they asked, are you willing to go back to the police station to talk to us? The other thing was they weren't looking for narcotics. They wanted him to go back and speak to a couple of homicide detectives. Did I understand you to say that he was only in the patrol car for a couple of minutes? That's correct. That's what he testified to. And then the men were taken away? So all of the activity at the side of the road was just five or eight minutes? It was very brief. So Judge King, he didn't go with us on the Terry Stoff argument, but he did find that there was probable cause to support this arrest. Yeah, he did say in his order that the description matched the defendant, which I think is not right. He could have said the match wasn't very good but they had probable cause in any event, but he said instead the description matched. Generic, younger. They matched in the sense that it was Hispanic and young. Right. Otherwise, no. Right. But like I say, that kind of generic description coupled with the specific with the car, and those are the cases that I cited in our 28-J letter as being sufficient for probable cause. Winbush, all they knew was it was an African-American driving a purple SUV, sufficient for probable cause. The Quinn case, they have no description of the two-armed bank robbers. All they had was a car and a license plate that, in fact, was owned by the suspect's girlfriend. Okay. Thank you. If there are no further questions. Thank you very much. Mr. Leslie, would you like a minute? Kind of a staccato number of quick points. First, with respect to the reason why the description is vague, the officer having the gun pointed, falling backwards, there were actually two officers at the scene, and their names are given at page 32 of the excerpt of the record. There was also another witness whose house they were at, so I don't think we can assume that that was the reason why the description was vague, was because of just the one officer, because there were two other people making observations. Second, as I'm sure the panel is aware, there's a difference between being in the car that is suspected of having been involved in an armed robbery and dropping someone off to pick that car up, and Mr. Lopez was never actually in the Ford Focus. All he did was drop someone off to pick it up eight hours later in the parking lot of a shopping building, so there's a lot of speculation that has to go on there that doesn't have to go on if it's closer to the events in question and if he's actually in the car that is having been suspected of being involved in the incident. And I think those are my points, Your Honor. Thank you very much. Thank you very much for a very good argument on both sides. The case of United States v. Lopez is now submitted for decision. We will take a ten-minute recess.
judges: Noonan, Tashima, W. Fletcher, Pollak